**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Larry CUNNINGHAM and DeVora Cunningham, Defendants-Appellants.**

**No. 85–1032.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 15, 1986.

Decided Oct. 30, 1986.

Ronald McDuffie (argued), Hatchett, De-Walt, Hatchett & Hall, Pontiac, Mich., for defendants-appellants.

Janice V. Terbush, Stephen Hiyama (argued), Detroit, Mich., for plaintiff-appellee.

Before ENGEL, KRUPANSKY and RYAN, Circuit Judges.

RYAN, Circuit Judge.

The defendant Larry Cunningham appeals his conviction in district court of one count of conspiracy to utter counterfeit obligations and two counts of uttering counterfeit obligations, and DeVora Cunningham, his wife, appeals her conviction of one count of conspiracy to pass counterfeit notes and three counts of passing counterfeit notes. 18 U.S.C. §§ 371, 472.

Appellants contend that the district court erred (1) in allowing testimony regarding the guilty plea of Charles Johnson, DeVora Cunningham's brother-in-law, to conspiracy charges in Wisconsin, and (2) in failing to

declare a mistrial based on the misconduct of the government's attorney in referring, in closing argument, to a bank account balance which the district court had excluded from evidence on defendant's timely objection at trial.

We hold that the district court erred in admitting Johnson's guilty plea, but that the error was harmless. Similarly, we hold that the prosecutor's inadvertent allusion to excluded evidence in her closing argument was improper, but that, in the absence of timely objection, this statement cannot be characterized as "plain error." We therefore affirm defendants' convictions.

## I.

### Facts

Between February 21 and March 18, 1984, defendants DeVora and Larry Cunningham passed nine counterfeit fifty- and twenty-dollar bills at five different locations in Detroit. The central issue at trial was whether they did so knowing the bills to be counterfeit.

Generally, the evidence offered on this issue was circumstantial. For example:

(1) All of the counterfeit bills passed issued from the same out-of-state counterfeiting operation;

(2) One of the alleged passes occurred *after* the telephone company notified Larry Cunningham that three of the fifty-dollar bills he had used to pay his phone bill were counterfeit;

(3) One witness claimed to recall Larry Cunningham as the man who gave her a counterfeit fifty-dollar bill "[b]ecause he asked me if we had to check the bill and I never had anyone ask me that before"; and

(4) Defendants offered various inconsistent explanations at trial for where they obtained the counterfeit bills.

The evidence most tending to fortify an inference that defendants knew the bills to be counterfeit related to the evident source of the bills. A Secret Service agent testified that the bills passed in Detroit came from a Milwaukee counterfeiting operation and that a man named Charles Johnson had supplied the paper for that operation. The agent also testified that at some point—the record does not state when—Johnson pleaded guilty to a charge of criminal conspiracy for his role in the Milwaukee counterfeiting scheme.

There was also evidence, from telephone company billing records, of a series of telephone calls between the defendants' home and business in Detroit and the home of Johnson and his wife, DeVora Cunningham's sister, in Milwaukee. These calls were made before, during, and after the period covered by the indictment in this case.

Defendants responded to this evidence with their own testimony that Johnson was DeVora Cunningham's brother-in-law and that, together with his wife, Johnson visited defendants in Detroit and stayed in their home February 17–20, 1984, the weekend before defendants began passing counterfeit bills. Defendants' testimony tended to suggest that Johnson could have learned, during his visit, of a shoebox full of cash the defendants kept in their closet and that Johnson had opportunities, over the weekend of February 17–20, 1984, to remove cash from that box, if he were so minded, and to replace it with counterfeit bills. Defendants testified that they were not close to Johnson, but that DeVora Cunningham and her sister were very close. The telephone calls, they suggested, were innocent social conversations between the two sisters.

The prosecution also produced evidence that defendants bought money orders with counterfeit bills even though they had a checking account at the time. In closing, the prosecutor argued that the only reason defendants resorted to the inconvenience of buying money orders was to launder the counterfeit bills.

Defendants responded with testimony that they were unable to write checks at the time in question because their bank had misplaced funds deposited in their checking account. In cross-examining DeVora Cun-

ningham, the prosecutor sought to pursue this inquiry with a question that began: "If I told you that the balances on your checking account at Michigan National Bank were over $1,000...." At this point, objection to the question was sustained.

Other evidence was admitted without objection that established incidentally that the Cunninghams were relatively prosperous. Larry Cunningham testified that his business had gross annual sales in the hundreds of thousands of dollars, that he owned almost the entire city block upon which his business was located, that he ordinarily kept over a thousand dollars in a shoebox in his home, and that he had kept between four and eight thousand dollars in that shoebox during the time period covered by the indictment. There was also evidence that DeVora Cunningham drove two expensive late-model cars.

## II.

### A

At trial, defendants made a motion in limine to exclude all testimony regarding Charles Johnson and the Wisconsin counterfeiting operation. They argued that this evidence is irrelevant, Fed.R.Evid. 401 & 402, because the source of counterfeit currency need not be shown to establish its counterfeit nature and because defendants were not alleged to be involved in any way with the Wisconsin operation. They also argued that, even if relevant, the evidence is substantially more prejudicial than probative, Fed.R.Evid. 403, because it taints defendants with Johnson's guilt but has no legitimate connection with the case against them.

No objection on hearsay grounds was made at trial. Thus, we do not address the claim raised in defendants' brief that the guilty plea was not admissible under the "statement by a co-conspirator" clause of Fed.R.Evid. 801(d)(2)(E) (pertaining to admissions by a party-opponent), nor do we address the government's argument that the guilty plea is admissible hearsay under Fed.R.Evid. 804(b)(3) as a statement against interest.

In response to defendants' motion to exclude all evidence regarding Charles Johnson, the prosecutor cited *United States v. Ritz*, 548 F.2d 510, 522 (5th Cir.1977), for the proposition that:

> "[T]he close association of the parties, i.e. Johnson and these Defendants, and particularly the parties' association with the source of the counterfeit currency, is one circumstance from which knowledge can be inferred by the jury."

The close congruence between this theory for the admissibility of the evidence and defendants' theory for its inadmissibility— that the government sought to substitute an inference of guilt by association for proof of the elements of the crime-suggests that the admissibility of the government's proofs was an issue not entirely beyond question.

The trial judge, however, in the exercise of his discretion, found the evidence to be prejudicial but also highly relevant on the issue of knowledge and fraudulent intent, and concluded that the prejudice did not substantially outweigh probative value under Fed.R.Evid. 403. The evidence was admitted.

This ruling by the trial judge is challenged here only insofar as it encompassed the government's offer of proof of Johnson's guilty plea. We are thus not called upon to review the overall soundness of the government's "close association with the source" theory of admissibility. Rather, we must consider whether the trial judge erred in his assessment of the probative value of one concededly prejudicial element of the government's circumstantial proofs.

### B

In the course of his testimony regarding the Milwaukee counterfeiting investigation, Secret Service Agent Gene Cunningham was asked if he knew "the disposition of Charles Johnson in Milwaukee, Wisconsin." He responded: "He pled guilty to the two-count Indictment charging him of conspiracy in the counterfeiting charge."

There is nothing in the record to suggest exactly why this particular testimony was considered relevant. In context, it seems to do no more than corroborate the fact that Johnson was involved in a counterfeiting scheme. The bare fact of his plea adds no detail or substance to what would otherwise already be known about Johnson. A willingness to plead guilty does not imply a general tendency to speak openly about one's criminal activities. Of itself, therefore, the guilty plea is little more than cumulative evidence on a collateral matter. We do not believe that the trial court held the plea—the most clearly prejudicial aspect of the government's proofs with respect to Johnson—to be relevant simply because it helped prove that Johnson was a counterfeiter.

On the basis of the government's arguments and assertions during the motion in limine, the court had grounds to believe that Johnson's guilty plea was being offered on the issue of defendants' knowledge because Johnson's plea—like the other information on Johnson's counterfeiting activities—was something defendants *could have known about* at the time of his Detroit visit or shortly thereafter. In this view of what the government offered to prove, the guilty plea would be significantly more probative of defendants' knowledge than other evidence of Johnson's involvement with counterfeiters. Generally, one may be inclined to keep one's criminal activities secret even from family and friends, but, once one has been convicted, secrecy would be much less feasible and probably pointless. Taken in conjunction with the other circumstantial evidence in the case, evidence that Johnson was a self-confessed and convicted counterfeiter would certainly fortify the inference that large-denomination bills obtained from him were obtained in the knowledge that they were counterfeit, providing the Cunninghams knew of the guilty plea.

The premise of the guilty plea's relevance, therefore, is that the plea occurred prior to the time when, according to the indictment, defendants "knowingly" agreed to pass and subsequently did pass counterfeit bills. According to the indictment, this knowledge existed as of February 21, 1984. According to the testimony of Joseph Viviano, the Secret Service agent who investigated the defendants in Detroit, the Secret Service did not take its initial action against the Milwaukee counterfeiters until two days later: "The Milwaukee office so-to-speak busted this plant or stopped the operation on February 23, 1984...." Milwaukee Secret Service Agent Cunningham, who was directly involved with the Milwaukee investigation, testified that that investigation did not even begin until February of 1984.

This testimony strongly suggests that defendants could not have known of Johnson's guilty plea—which must have occurred sometime after the operation was discovered and shut down—at any time covered by the indictment. Furthermore, this testimony plainly implies that the plea could not have been made before February 21, 1984, when the first counterfeit bills were passed in Detroit.

■ Even if the record does not clearly support an inference that Johnson's guilty plea postdated the period covered by the indictment in this case, there is no contrary showing anywhere in the record that the Cunninghams knew of Johnson's guilty plea at any pertinent time. Because such a showing was an implicit premise of the guilty plea's relevance, this evidence does not make defendants' guilty knowledge any more probable than it would be without the evidence. Therefore, Johnson's guilty plea was strictly irrelevant under Fed.R.Evid. 401 and its admission was error.

**C**

■ The Supreme Court has "consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless...." *United States v. Lane,* 474 U.S. ——, ——, 106 S.Ct. 725, 730, 88 L.Ed.2d 814, 823 (1986). Despite the clear danger of guilt by association foreboded by an offer to prove that a relative of defend-

ants has been convicted of the same crime for which they are on trial, we conclude, on the basis of the whole record in this case, that the trial court's error was harmless. Fed.R.Crim.P. 52(a).

As this Court has previously remarked: "An error in the admission of evidence may be cured by the subsequent use of similar evidence by the opposite party." *Cordle v. Allied Chemical*, 309 F.2d 821, 825 (6th Cir.1962). Until defendant Larry Cunningham took the stand to testify, all that was known about Johnson was that phone calls had been made between his phone number and defendants' phone numbers and that the bills passed by defendants came from an operation with which Johnson was connected. Larry Cunningham fleshed this association out significantly, attempting to utilize it to his advantage, by testifying that Johnson was his brother-in-law and that Johnson had stayed in his home in Detroit. Having chosen to make advantageous use of the Johnson connection, and to distance themselves from Johnson by suggesting that they were the innocent dupes of a known criminal, defendants waived further objection to this evidence. Thus, even if admitting evidence about Johnson had initially been erroneous, the error would have been obviated by defendants' own testimony.

Furthermore, while we are loath to penalize the defense for making the best of an adverse ruling, defense counsel's effort to distance his clients from Johnson was well served by the evidence of Johnson's guilty plea. Larry Cunningham testified that he had learned of Johnson's guilty plea only from testimony at trial. Then, in his closing argument, defense counsel chose to stress Johnson's guilty plea in words clearly intended to ring in the jurors' ears as they departed to deliberate:

"[Y]ou have to understand, we don't know how that money got there and my clients to this day still don't know for sure. But they do know one thing. They know that Charles Johnson pled guilty to conspiracy to counterfeit. They know they have not pleaded guilty.

They know they are before you asking for justice and I ask you to give them justice."

In this final plea to the jury, defense counsel sought to reverse the implication of guilt by association by suggesting that Johnson's guilt was the premise of defendants' innocence; that because we now know Johnson to be a convicted counterfeiter, it is more probable that he would have planted counterfeit bills in defendants' home in such a way as to implicate them in his counterfeiting scheme. If the jury rejected this appeal, it was not because defendants had already been irretrievably tainted with Johnson's guilt, but simply because the government's theory was better substantiated and more consistent with the other evidence presented. In the context of the undisputed evidence that Johnson was a counterfeiter, evidence the admissibility of which is not challenged here, and in light of the use made of his guilty plea by the defense, admission of the guilty plea in evidence had little, if any, impact upon the overall tenor of the evidence which convicted defendants.

Accordingly, we hold that while the guilty plea was irrelevant to prove what it was originally offered to prove, the decision to admit this evidence was harmless error.

### III.

### A

Defendants' second assignment of error relates to the prosecutor's allusion, in her closing argument, to the size of defendant DeVora Cunningham's checking account balance. This evidence had been excluded by the trial court upon timely objection by the defense.

At trial, in response to the prosecutor's suggestion that defendants had no need to buy money orders except to "launder" the counterfeit bills, Larry Cunningham testified that his bank had mistakenly deposited ten thousand dollars intended for his commercial checking account into his commercial savings account. On cross-examina-

tion, DeVora Cunningham testified, *without objection*, that she had a checking account. It is not clear from the record whether this was a different account from the checking account previously mentioned. Subsequently, the prosecutor sought to suggest that DeVora Cunningham's checking account had a balance over one thousand dollars at the time she was buying money orders for such purposes as paying her credit card bills. It was only at this point that defendants' objection to the question was sustained. Thus, it is only the size of the balance in this account which was excluded by the trial court's ruling.

In her closing argument, the prosecutor alluded to this excluded evidence:

"DeVora Cunningham says she has a checking account, but nonetheless, she wanted to pay all of these bills, the Hughes & Hatcher and the Visa and the mother, that we have offered into evidence, with money orders. Well, she indicated that it is simpler to write a check. *She had over a thousand dollars in her checking account.* Why not just sit and write a check? Why go out and buy a money order? Why stand in line with money and buy a money order? There is simply no explanation for that. Unless, of course, you are buying it with counterfeit money." (Emphasis added.)

In his closing, defense counsel responded:

"I want to give you one example of the behavior of the U.S. Attorney's Office in this case. In closing argument, and out of courtesy, I did not get up and object. I did not interrupt the U.S. Attorney. But you will recall, when she was questioning my client, Mrs. Cunningham, this morning she wanted to ask about her checking account at a Michigan National Bank. I objected. The Judge sustained my objection. The Judge said anything about that bank account was irrelevant. That means that there was no evidence introduced about that bank account.

"In closing argument we are limited to the evidence that came from the witness stand and the exhibits which were brought in and brought in and given to you and given to the Court as exhibits. But in closing argument, despite the Judge's sustaining of my objection, the U.S. Attorney had the audacity to tell you that my client had $1,000 in another checking account. See, that is something that she should be reprimanded for. Not by me but by the Court. But I will leave that alone. I just want to bring that to your attention because out of courtesy I did not object at that time and I had a proper objection because my objection had been sustained. That meant she was prohibited from making any mention of that bank account."

In rebuttal, the prosecutor cautioned the jury to hold her admitted misstep against her rather than the government. The trial court's instructions then reminded the jurors once again that closing arguments are not evidence.

**B**

Defense counsel chose not to object to the prosecutor's error in a timely fashion, preferring instead to dwell upon the error himself and to mischaracterize the scope of the court's exclusion, which clearly extended only to the account balance, not to the existence of the account. Defendants now contend that it was reversible error on the trial court's part not to declare a mistrial *sua sponte.* We reject this contention.

Because defendants failed to object, move for a mistrial, or request a curative instruction, this Court can reverse only if it finds that plain error was committed, Fed. R.Crim.P. 52(b); *United States v. Benson,* 389 F.2d 376, 378–79 (6th Cir.), *cert. denied,* 391 U.S. 903, 88 S.Ct. 1652, 20 L.Ed.2d 418 (1968). In *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court reversed a finding of plain error despite improper closing argument by the prosecutor that was much more sustained and egregious than the isolated incident here.

64

In *Young,* the prosecutor repeatedly expressed his personal opinion of the guilt of the defendant, referred to his own expertise as a prosecutor to bolster this opinion, and told the jury that if they acquitted they would not be "doing [their] job as jurors." 470 U.S. at 6, 105 S.Ct. at 1041, 84 L.Ed.2d at 6; 470 U.S. at 19, 105 S.Ct. at 1049, 84 L.Ed.2d at 16 (Brennan, J., concurring in part and dissenting in part). Despite prosecutorial conduct that was clearly in violation of ethical rules, the Court held that there was no reversible error, in the absence of timely objection, when the prosecutor's conduct was viewed in the whole context of the case.

In the context of this case, we fail to perceive how this isolated error could have prejudiced defendants. The existence of bank accounts had been admitted without objection. The relevance of the bank account balance had been clearly shown. Other evidence had incidentally made defendants' material circumstances manifest to the jury. The record does not reflect a trial strategy by the prosecutor of "persistent appeal to class prejudice," *United States v. Stahl,* 616 F.2d 30, 33 (2d Cir. 1980). By the end of the trial, any justification for the initial ruling excluding the evidence had evaporated. The prosecutor's improper allusion to the excluded bank balance was therefore incapable of swaying the jury.

In *Young,* an important aspect of the context was that misconduct by defense counsel had "invited" an improper prosecutorial response. While there is no comparable circumstance here, we can say, with the *Young* Court, that: "Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young,* 470 U.S. at 16, 105 S.Ct. at 1047, 84 L.Ed.2d at 13. We therefore hold that it was not error that the court failed to declare a mistrial in response to the prosecutor's misconduct in alluding to excluded evidence.

Defendants' convictions are AFFIRMED.