**UNITED STATES of America, Appellee,**

**v.**

**ST. MICHAEL'S CREDIT UNION and Janice Sacharczyk, Defendants, Appellants.**

**Nos. 88-1848, 88-1986.**

United States Court of Appeals, First Circuit.

Heard Feb. 28, 1989.

Decided July 7, 1989.

Kathy B. Weinman and Harvey Weiner with whom Thomas E. Dwyer, Jr., Boston, Mass., D. Anthony Parks, Dwyer & Collora, Allen N. David and Peabody & Arnold, Boston, Mass., were on joint brief, for appellants.

Martha M. Coakley, Sp. Atty., Dept. of Justice, with whom Frank L. McNamara, Jr., U.S. Atty., Pittsburgh, Pa., and Jeremiah T. O'Sullivan, Sp. Atty., Dept. of Justice, Boston, Mass., were on brief, for U.S.

Before BOWNES, Circuit Judge, COFFIN, Senior Circuit Judge, and FUSTE,* District Judge.

BOWNES, Circuit Judge.

This case arises out of the alleged illegal activities of St. Michael's Credit Union and one of its employees, Janice Sacharczyk. St. Michael's was convicted of failing to file Currency Transaction Reports with the Internal Revenue Service on thirty-nine occasions during the period from September, 1983 to September, 1984 in violation of the Currency Transactions Reporting Act, 31 U.S.C. §§ 5313 & 5322(b). Sacharczyk was convicted of knowingly and willfully aiding and abetting St. Michael's failure to file. These omissions formed the basis for additional convictions of both defendants for concealing, by trick, scheme and device, material facts from the IRS under 18 U.S.C. § 1001. Defendants appeal their convictions citing numerous errors.

## I. STATUTORY FRAMEWORK

As this case involves the interpretation of an intricate statute, a brief overview of the legislation is necessary to understand the issues presented.

The Currency Transactions Reporting Act, also known as the Bank Secrecy Act, 31 U.S.C. § 5313 provides:

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

The Act's implementing regulations flesh out this statutory language. The regulations in effect during the indictment period mandated that: "Each financial institution

* Of the District of Puerto Rico, sitting by designation.

... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000...." 31 C.F.R. § 103.22(a). A "transaction in currency" was defined as "[a] transaction involving the physical transfer of currency from one person to another." 31 C.F.R. 103.21. Reports of these transactions must be made on Internal Revenue Service Form 4789, known commonly as a Currency Transaction Report (CTR). A failure to file a CTR may be prosecuted as a felony when the omission occurs "while [the defendant is] violating another law of the United States, or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period...." 31 U.S.C. § 5322(b).

By forcing financial institutions to keep such records, Congress hoped to maximize the information available to federal regulatory and criminal investigators. The overall goal of the statute was to interdict the laundering of illegally obtained and untaxed monies in legitimate financial institutions. *See generally, California Bankers Ass'n v. Schultz,* 416 U.S. 21, 26–30, 94 S.Ct. 1494, 1500–02, 39 L.Ed.2d 812 (1974) (noting purposes of Act).

## II. FACTS

We review the facts in the light most favorable to the government. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Campbell,* 874 F.2d 838, 839 (1st Cir.1989).

St. Michael's was a small financial institution that catered to the people who lived in and around Lynn, Massachusetts. A great deal of its operation was devoted to serving the needs of the ethnic Polish community in Lynn. The organization and management of St. Michael's was, by all accounts, unprofessional and deficient. Due in part to this mismanagement, it was taken over by Massachusetts Share Insurance Corporation in September, 1984.

Janice Sacharczyk was employed at the credit union and served as its bookkeeper, computer operator, clerk, and treasurer. On December 13, 1983, she resigned her position as treasurer but continued to work at the credit union until September 6, 1984, despite bearing a child in the spring of 1984. Her main responsibility at the credit union was "to prove" its books to ensure that all of the money that went in or out was accounted for in the records. She also ran the computers and accessed information contained therein for others. Occasionally, she approved checks and obtained more money for tellers who had used up their initial allotment of cash.

For eight weeks between September and November 1983, St. Michael's was audited by John DiPerna, the Banking Examiner for the Credit Union Division of the Banking Commission of Massachusetts. DiPerna testified at trial that the audit was to "evaluate the assets and ascertain that all the liabilities in the institution[ ] are shown on the balance sheet" and to ensure the institution's compliance with state and federal laws and regulations.

During the audit, a member of DiPerna's staff discovered that on two occasions, St. Michael's had failed to file CTRs with the IRS. Although the law requiring the filing of CTRs had been passed in the 1970's, it was only in 1982 or 1983 that DiPerna was instructed by the federal government to enforce the law's provisions against state institutions. DiPerna met with Sacharczyk to discuss the CTRs. He told her that CTRs must be filled out and filed with the IRS whenever there are withdrawals or deposits of currency exceeding $10,000. DiPerna testified that "it was evident that they [defendants] were unaware of the law....." As was his custom at the time, DiPerna told Sacharczyk that if St. Michael's filed the CTRs for the two transactions, he would not report the omissions as violations. He also gave Sacharczyk an outdated and incomplete copy of the regulations that govern CTRs. Omitted from the regulations were the sections that dealt with civil and criminal penalties for the failure to file. DiPerna left the credit un-

ion telling "them to start keeping track of currency transactions over $10,000."

In February, 1984, DiPerna returned to St. Michael's for a "bring-up exam." At that time, Sacharczyk showed him xerox copies (showing only the fronts) of the CTRs he had told her to file with the IRS (the French and Perry CTRs). She stated that they had been sent to the IRS and, therefore, DiPerna did not mention them in his audit report. These CTR forms detailed both the reasons for requiring CTRs *and* the civil and criminal penalties for failing to file.

Contrary to the averment of Sacharczyk that the CTRs were sent to the IRS, Yvonne Covington, the IRS official in charge of keeping records on CTR filings, testified that no CTRs were filed by St. Michael's between September 1983 and October 1984. Covington acknowledged that records for that period had only recently been moved from Ogden, Utah to Detroit, Michigan, but asserted that "to our knowledge all documents were received...."

In September, 1984, agents of the IRS' Financial Task Force began an investigation of St. Michael's. Special Agent DeAngelis questioned Sacharczyk concerning her knowledge of CTRs. She stated that DiPerna had discussed them with her and that she had filed CTRs for the two currency transactions that DiPerna had brought to her attention. She then searched the basement and produced xeroxed copies of the CTRs she claimed to have sent to the IRS. Sacharczyk told the agents that St. Michael's had no official policy regarding CTRs. When the agents asked her whether there was a CTR compliance officer at St. Michael's, she responded "no." When asked whose responsibility it would be to file CTRs, she stated that either the Manager, Barbara Szczawinski, or herself would be responsible.

The Task Force investigation of St. Michael's uncovered a number of $10,000 transactions for which no CTRs had been filed. These formed the basis for the indictment in this case. The indictment charged Sacharczyk and Barbara Szczawinski with knowingly and willfully aiding and abetting St. Michael's failure to file CTRs in violation of 31 U.S.C. §§ 5313, 5322(b) & 18 U.S.C. § 2(b), and of aiding and abetting St. Michael's concealment by trick, scheme or device of material facts from the IRS in violation of 18 U.S.C. §§ 1001 & 2(b). A conspiracy count was also part of the indictment. All three defendants were tried together. The jury found Szczawinski not guilty on all charges. Sacharczyk and St. Michael's were convicted on thirty-nine counts of felonious failure to file CTRS and on one count of concealing material facts from the IRS. Sacharczyk was acquitted on the conspiracy count. She received a one-year suspended sentence with probation and a $1,000 fine. St. Michael's was fined $10,000. Defendants moved for acquittal or in the alternative for a new trial under Fed.R.Crim.P. 29. The motion was denied. Sacharczyk and St. Michael's duly filed their notice of appeal.

The district court found that St. Michael's could be bound only by the actions, conduct and statements of Sacharczyk (and Szczawinski). The liability of the credit union is thus measured by the liability of Sacharczyk. We refer to St. Michael's and Sacharczyk as defendants rather than as principal and aider and abettor since their liabilities are coterminous. *See* 18 U.S.C. § 2(b) (aider and abettor punished as principal).

Defendants assert the following grounds for reversal of their convictions: (1) the evidence was insufficient to prove beyond a reasonable doubt that Sacharczyk knowingly and willfully failed to report large currency transactions to the IRS; (2) the evidence was insufficient to warrant giving the jury an instruction on willful blindness; (3) the evidence was insufficient to prove "a pattern" of illegal activity; (4) the evidence was insufficient to prove concealment by use of a trick, scheme or device in a matter before the IRS; (5) some of the transactions that were bases for the defendants' convictions were not reportable transactions; (6) the court erred by refusing to give a missing witness instruction; (7) the court erred by admitting evidence concerning extrinsic gambling activi-

ties of Sacharczyk's father; and (8) the government's closing argument unduly prejudiced defendants' right to a fair trial.

## III. THE CURRENCY TRANSACTIONS REPORTING ACT CONVICTIONS

Our analysis is governed by the following:

> [T]he standard of review for a judgment of acquittal notwithstanding the verdict is identical to the test employed to measure the sufficiency of evidence supporting a guilty verdict. The test is whether, considering the evidence as a whole, taken in the light most favorable to the government, together with all legitimate inferences that can be drawn from such evidence, a rational trier of fact could have found guilt beyond a reasonable doubt. *United States v. Hensel,* 699 F.2d 18, 33 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Patterson,* 644 F.2d 890, 893 (1st Cir. 1981) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We must resolve any issue of credibility in favor of the jury's verdict, *United States v. Winter,* 663 F.2d 1120, 1127 (1st Cir.1981), and we must defer to the jury's verdict if the evidence can support varying interpretations, *United States v. Rivera–Sola,* 713 F.2d 866, 869 (1st Cir.1983). In other words, the prosecutor need only produce that quantum of evidence by which a reasonable trier of fact *could* find guilt beyond a reasonable doubt; there is no requirement to produce evidence that would *compel* a finding of guilt beyond a reasonable doubt.

*United States v. McNatt,* 813 F.2d 499, 502 (1st Cir.1987).

In order to sustain the defendants' felony convictions under 31 U.S.C. § 5322(b) the government must prove the following beyond a reasonable doubt:

> *First,* that a financial institution was involved in a currency transaction exceeding $10,000;
>
> *Second,* that in connection with such a currency transaction, no currency transaction report was filed at the time required;
>
> *Third,* that the failure to file the Currency Transaction Report at the time required was willful; and
>
> *Fourth,* that the failure to file was part of a pattern of illegal activity involving transactions of more than $100,000 during a twelve month period.

Brief for the government at 24; *see* 31 U.S.C. §§ 5313 & 5322. Of these elements, the defendants assert that the evidence is insufficient to establish that the failure to file: (1) was "willful," *i.e.,* done with either actual knowledge or willful blindness and/or (2) was part of a "pattern of illegal activity." We deal with each of these contentions separately.

### A. *Knowing and Willful Violation of 31 U.S.C. § 5322(b)*

Our analysis focuses upon the propriety of the trial judge's willful blindness instruction and the sufficiency of the evidence. Sacharczyk argues that the lower court should not have instructed the jury on willful blindness because the government failed to produce any evidence to support such an instruction. She maintains that the government has not presented "evidence of a *conscious* course of *deliberate* ignorance, *i.e.,* of purposeful blinding while knowing that a crime was likely in progress...." *United States v. Masse,* 816 F.2d 805, 812 (1st Cir.1987) (emphasis in original). Lastly, she contends that even if the instruction was warranted, the evidence was insufficient to establish willful blindness beyond a reasonable doubt. The failure to file CTRs, she asserts, was due to negligence and oversight rather than to criminal intent. We disagree.

A "willful blindness instruction is appropriate when: (1) defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood by a juror as *mandating* such an inference." *United States v. Hogan,* 861 F.2d 312, 316–17 (1st Cir.1988) (emphasis added); *see United States v. Littlefield,* 840 F.2d 143, 147 (1st Cir.), *cert.*

*denied,* — U.S. —, 109 S.Ct. 155, 102 L.Ed.2d 126 (1988); *United States v. Kaplan,* 832 F.2d 676, 682 (1st Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988); *United States v. Masse,* 816 F.2d at 812; *United States v. Martin,* 815 F.2d 818, 823 (1st Cir.), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987); *United States v. Krowen,* 809 F.2d 144, 148 (1st Cir.1987); *United States v. Rothrock,* 806 F.2d 318, 322 (1st Cir.1986); *United States v. Picciandra,* 788 F.2d 39, 46 (1st Cir.), *cert. denied,* 479 U.S. 978, 107 S.Ct. 481, 93 L.Ed.2d 425 (1986).

In the case at bar, there is no issue concerning requirements one and three. Sacharczyk's main line of defense was that she had no knowledge of the failures to file CTRs or of the consequences of such omissions. And the trial judge took care to instruct the jury that a willful blindness instruction does not mandate an inference of willful blinding.[1]

We thus limit our discussion to the second willful blindness prerequisite: did the government present evidence that suggested a course of deliberate blindness by Sacharczyk? We believe it did. The following evidentiary facts might support a finding that Sacharczyk deliberately chose a course of willful blindness to the CTR violations. First, in the fall of 1983, DiPerna spoke with her concerning the filing of CTRs. While the regulations he provided her omitted any mention of civil or criminal penalties, their discussion put her on notice that CTRs needed to be filed for certain currency transactions that exceeded $10,000 and that the credit union had participated in at least two such transactions in the preceding year. Second, in February, 1984, DiPerna again spoke with Sacharczyk concerning the necessity of filing CTRs. At that time she told DiPerna that she had filed the French and Perry CTRs with the IRS. She showed him xeroxed copies of these filled-out forms. Third, on the backs of these CTRs were directions for answering the questions asked on the fronts of the forms. Also detailed were the civil and criminal penalties that could result from a failure to file. Fourth, when agents of the IRS questioned Sacharczyk concerning her knowledge of CTRs, she explained that DiPerna had been the first to inform her of their existence and that on his request she had filled out and filed two CTRs. She produced copies of these for the agents along with the CTR regulations that DiPerna had given her. Finally, the government asserted that in her role as treasurer/bookkeeper/clerk, Sacharczyk would have had the opportunity to learn that currency transactions exceeding $10,000 were taking place at the credit union.

"The purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps." *Rothrock,* 806 F.2d at 323; *see United States v. Zimmerman,* 832 F.2d 454, 458 (8th Cir.1987) (willful blindness instruction "allows the jury to impute knowledge to [a defendant] of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlightenment."). While individually none of the facts here point to a deliberate course of willful ignorance, tak-

1. He charged the jury as follows:

Now, I have said that knowledge can be established by way of inference. And an inference of knowledge may be drawn from the fact, if you find it to be a fact, that a person deliberately closes his or her eyes to what would otherwise have been obvious to them. Now, you have to be careful. You may not draw an inference of knowledge from negligence or mistake. Negligence indeed, even gross negligence, is not a proper basis to support a finding of willfulness or to support a finding of knowledge. Nor is error, nor is mistake. Willful blindness may constitute knowledge of a fact only if you should find that the individual to whom knowledge is sought to be attributed was aware of a high probability that that fact existed. I ask you to keep in mind that I'm not suggesting one way or the other as to how you should find. I'm not suggesting that you should make any such finding; I'm simply telling you that you may infer knowledge if you find willful blindness to a fact.

These women are said by the Government to have deliberately ignored currency transactions knowing that would constitute a violation of reporting requirements. That must be proved by the Government beyond a reasonable doubt for you to find that it is so.

en together, we believe, they present a sufficient basis for the willful blindness instruction.

Though the evidence was not overwhelming, the jury had a reasonable basis for inferring that Sacharczyk had read the backs of the CTRs in order to fill them out. As noted, the backs of these forms also contained warnings concerning the penalties for not filing CTRs. Given these facts, the jury could have inferred that Sacharczyk knew that the failure to file CTRs was against the law. Based on DiPerna's discovery of the two unreported transactions, Sacharczyk was put on notice that the credit union, in fact, handled reportable transactions. These inferences, and Sacharczyk's position at the credit union, support a finding that if she did not know about the specific transactions charged in the indictment, it was only because she consciously chose to be ignorant of them. We believe that the evidence and inferences permissibly drawn therefrom were sufficient to support both the willful blindness instruction and the jury's ultimate determination of willful failure to report beyond a reasonable doubt.

B. *A "Pattern of Illegal Activity"*

The Currency Transactions Reporting Act defines both felony and misdemeanor offenses for knowing and willful failures to file CTRs. The felony provisions are implicated when:

> A person willfully violat[es] this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period....

31 U.S.C. § 5322(b). In the case at bar, the government charged the defendants with felonious violations, alleging that the acts named in the indictment constituted a "pattern of illegal activity involving transactions of more than $100,000 in a 12-month period." The trial judge instructed the jury that it could find there was a pattern of illegal activity if it determined "beyond a reasonable doubt that there were repeated and related violations" of the Act. The defendants argue that the government has failed to produce any evidence that could support a finding that the transactions named in the indictment formed a "pattern of illegal activity." We cannot agree.

In *United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir.), *cert. denied*, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987), we dealt with the issue of what constitutes a "pattern of illegal activity" under 31 U.S.C. § 5322(b). We affirmed the felony convictions of the Bank for failing to file CTRs for thirty-one currency transactions, each involving the same individual customer and the same form of currency transfer. In interpreting the meaning of the phrase "pattern of illegal activity," we examined the limited case law on point. *See United States v. Valdes–Guerra*, 758 F.2d 1411, 1414 (11th Cir.1985); *United States v. Dickinson*, 706 F.2d 88, 92 (2d Cir.1983); *United States v. Beusch*, 596 F.2d 871, 878 (9th Cir.1979) (interpreting same language in 31 U.S.C. § 5322(b)'s predecessor statute). We concluded that to form a pattern under the Act, the transactions must be "repeated *and* related." *Bank of New England*, 821 F.2d at 853 (emphasis in original). Although the trial judge in that case had charged the jury that a pattern could be established by proving repeated violations, she did not instruct that the transactions also must be related. We found that did not constitute plain error because:

> Under the evidence adduced, it was clear that the repeated failures by the Bank to report were directly related to the withdrawals by McDonough [the individual customer]. These failures were not isolated events; they entailed repeated failures to file CTRs on similar transactions by the same customer. The similarity of the transactions, coupled with the frequency and regularity of their repetition, establish a related scheme.

*Id.*

Sacharczyk and St. Michael's argue mightily that here, unlike in *Bank of New*

*England,* there is absolutely no evidence that would link the currency transfers named in the indictment to one another. They stress that the indictment charged fifty different violations of the Act involving twenty-five different customers. They point out that the transactions named in the indictment consisted of differing forms of currency transfers: cash withdrawals, cash deposits, purchases of Treasurer's checks, loan proceeds, and the cashing of third-party checks. Absent evidence of some relation among these transactions, Sacharczyk and St. Michael's contend that they are simply repeated, "isolated events," which are prosecutable only under the misdemeanor provision of the Act. *See Bank of New England,* 821 F.2d at 853; *Dickinson,* 706 F.2d at 92 ("The requirement that the violations be part of a pattern merely excludes cases where the violations are isolated events and not part of a common or systematic scheme."). Although this is a plausible reading of the "repeated and related" standard set forth in *Bank of New England,* we believe it proves too much and refuse to read that standard so narrowly.

At the outset, we reaffirm that to establish a pattern of illegal activity under the Act, the government must prove that the transactions involved were both repeated and related to one another. *See Bank of New England,* 821 F.2d at 853. In the normal prosecution under 31 U.S.C. § 5322(b), a financial institution is indicted for failing to file CTRs for a limited number of transactions; the institution has filed CTRs for certain transfers while failing to file them for others. To prove a pattern of illegal activity in such a case, the government must establish an underlying relationship or linkage among the unreported transactions. To do this it might prove, *inter alia,* a common feature among the customers involved, the forms of transfers of currency, and/or the purposes for which the funds were used. *See, e.g., Bank of New England,* 821 F.2d at 853.

In a case like the one at bar, however, where a financial institution has systematically failed to file *any* CTRs, the above approach is inapt. While a relationship must still be established, it may be proven without linking the underlying transactions. The necessary connection can be shown by proving that the financial institution chronically and consistently failed to file any CTRs. By showing a consistent failure to report, the government has proven an overall relationship among the transactions. There is a pattern of not reporting.

The language of the statute and its legislative history support this interpretation. 31 U.S.C. § 5311 declares that the purpose of the statute is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." We agree with the Second Circuit that, in passing this legislation

> Congress was largely concerned with the fact that the relative freedom accorded domestic and foreign currency transactions by American law in combination with the secrecy accorded currency transactions by certain foreign nations facilitated major criminal schemes, such as the laundering of money earned in criminal enterprises, the evasion of income taxes by gambling establishments, and the perpetuation of multinational securities frauds. In selecting among remedies, Congress rejected substantive restrictions on monetary or currency transactions but instead provided for a system of compulsory recordkeeping and reporting designed to diminish the advantages accorded such illegal activities by existing domestic and foreign law. *See generally Currency and Foreign Transactions Reporting Act: Hearings on H.R. 15073 Before the House Committee on Banking and Currency,* 91st Cong., 1st and 2d Sess. 11 (1970); *Currency and Foreign Transactions Reporting Act: Hearings on S. 3678 and H.R. 15073 Before the SubComm. on Financial Institutions of the Senate Committee on Banking and Currency,* 91st Cong., 2d Sess. 13 (1970); H.R.Rep. No. 975, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Ad.News 4394–4416.

*Dickinson,* 706 F.2d at 91–92; *see also California Bankers Ass'n v. Shultz,* 416 U.S. 21, 26–30, 94 S.Ct. 1494, 1500–02, 39 L.Ed.2d 812 (1974) (noting same). "Congress evidently believed that to effectively fight petty criminals, members of the underworld, white collar criminals, and income tax evaders it was necessary for financial institutions to maintain adequate records." *United States v. Kattan–Kassin,* 696 F.2d 893, 896 (11th Cir.1983).

When the government proves that a financial institution has willfully failed to file CTRs for any of its reportable transactions or that it has filed for only a few out of a vast number of its reportable transactions, a sufficient relationship has been established between those acts to constitute a pattern of illegal activity and thereby trigger the Act's felony provision. Congress placed the responsibility for filing CTRs on the financial institutions. It is incongruous to believe that Congress intended that a financial institution could insulate itself from felony prosecution by showing that it had not filed CTRs for any of its reportable transactions. Such a systemic disregard of the Act's reporting requirements is an open invitation to money launderers and other criminals to use the financial institution for hiding their ill-gotten gains. Moreover, allowing only misdemeanor prosecutions of such pervasive and repeated violations may not be sufficient to deter future transgressions. As the House Report explained in discussing the felony provisions of the Act:

> It should be noted that serious violations under this title may involve very large sums of money, and fines of as much as $10,000 or more might be shrugged off as a mere cost of doing business. To have any real deterrent effect, the potential fine must be large enough to have some real economic impact on potential violators.

H.R.Rep. No. 975, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 4394, 4406; *see also Valdes–Guerra,* 758 F.2d at 1414; *United States v. So,* 755 F.2d 1350, 1355 (9th Cir. 1985); *Dickinson,* 706 F.2d at 92; *Kattan–Kassin,* 696 F.2d at 897.

We hold that under the standards outlined above, there was sufficient evidence for the jury to have found that St. Michael's failure to file any CTRs comprised "a pattern of illegal activity."

## IV. THE 18 U.S.C. § 1001 CONVICTIONS

Defendants contest their convictions for violating 18 U.S.C. § 1001. The statute provides:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, will be fined not more than $10,000 or imprisoned not more than five years, or both.

St. Michael's and Sacharczyk assert that: (1) the trial judge's instructions failed to apprise the jury that an "affirmative act" of concealment was a prerequisite to convicting for the offense; (2) the evidence was insufficient to establish such an act; and (3) the government failed to prove any concealment or misrepresentation concerning a "matter within the jurisdiction of any department or agency of the United States." While we are unpersuaded by defendants' latter two contentions, we reverse the § 1001 convictions because we find that the judge's jury instruction was fatally flawed.

### A. *The Charge*

The judge instructed as follows on the § 1001 count:

> It is the Government's charge that Barbara, Janice, and the Credit Union, knowingly, willfully concealed material facts by trick, scheme or device; that what they were doing was concealing the true nature of these large currency transactions from the Internal Revenue Service. And there is a statute which says that you may not knowingly, willful-

ly conceal material facts from an agency of the Government performing its functions. That's a violation, if you personally do it, of a statute that bears number 1001 of Title 18. I'm sure that's of no particular interest to you. But if one assists another person in doing that, then the person who aids, abets, commands, induces or assists another is responsible as a principal, even though they are what people ordinarily call an aider and an abettor.

The quarrel defendants have with this instruction is that it allowed the jury to find them guilty based solely on the fact that they failed to file CTRs. What is lacking in the charge, they assert, is the requirement that the government prove some "affirmative act" of concealment beyond the failure to file CTRs. The government accepts this standard as well: "Mere passive failure to reveal a material fact to a federal agency will not sustain a 1001 conviction; the government must prove an affirmative act by which a material fact is actively concealed." Brief for government at 39; *see United States v. Shannon,* 836 F.2d 1125, 1129–30 (8th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *see also United States v. Woodward,* 469 U.S. 105, 108 & nn. 4–5, 105 S.Ct. 611, 612 & nn. 4–5, 83 L.Ed.2d 518 (1985). We agree that an affirmative act of concealment is necessary to prove the "trick, scheme or device" element of the § 1001 offense. *See Woodward,* 469 U.S. at 108 & nn. 4–5, 105 S.Ct. at 612 & nn. 4–5.

In an attempt to save the conviction on this count, the government seems to argue that, even though the jury was not specifically charged that an affirmative act of concealment must be found in order to convict, it necessarily must have concluded that defendants engaged in affirmative acts of concealment. Thus, it contends we may affirm because any error in the charge was harmless. *See, e.g., United States v. Doherty,* 867 F.2d 47, 57–58 (1st Cir.1989) ("An erroneous instruction on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element."). The government offers the following evidence of affirmative acts to support the § 1001 convictions: (1) Sacharczyk prepared the French and Perry CTRs for $10,000 transactions; (2) she showed copies of these to DiPerna telling him that they had been filed; (3) she never filed the CTRs with the IRS.

While the government is correct that these facts, if believed by the jury, would be sufficient to sustain a conviction under § 1001 that does not dispose of the issue. Defendants maintain that the jury may have disbelieved the government's evidence concerning this incident and still have found them guilty under § 1001 simply for not filing CTRs. We agree. In *Doherty,* we affirmed convictions based upon faulty instructions because we were certain that the jury *must have found* all of the necessary elements of the crime, *see Doherty,* 867 F.2d at 58. In this case, however, we cannot say with any degree of certitude that the jury would have come out the same way had they been correctly instructed. Given the closeness of this issue, such an error cannot be harmless beyond a reasonable doubt. *See United States v. Mazza,* 792 F.2d 1210, 1216–17 (1st Cir.1986) (describing harmless error standard).

There is one additional argument made by the government that requires a response. It argues that Sacharczyk's affirmative misrepresentations to DiPerna concerning the filing of the French and Perry CTRs, standing alone, would be enough to sustain the § 1001 convictions. This argument is at best misguided.

The grand jury indicted the defendants in pertinent part as follows:

> 56. The defendant[s] ... concealed material facts from the Internal Revenue Service in a matter under its jurisdiction, as herein described:
>
> a. The defendants ... failed to file, and caused the failure to file, Currency Transaction Reports (IRS Forms 4789)....

> b. That in addition to the transactions referred to in paragraph 56(a) herein, the defendants ... further engaged in a trick, scheme and device which enabled them to withhold the filing of Currency Transaction Reports on behalf of St. Michael's Credit Union for two separate currency transactions, and thereby withhold and conceal material facts from IRS in a matter under its jurisdiction, by creating copies of false and fictitious Currency Transactions [sic] Reports and representing to bank examiners for the Commonwealth of Massachusetts they were retained copies of those Currency Transaction Reports which had been filed with IRS; said false representation and display causing the bank examiners to conclude that St. Michael's Credit Union was in compliance with Federal Currency Reporting Laws and further caused the examiners to abandon their investigation of St. Michael's Credit Union's compliance with said laws.

The judge's instructions to the jury mirrored the indictment. *See supra* pp. 588–589.

Section 1001 is written in the disjunctive; the offenses are separated by the word "or." 18 U.S.C. § 1001. The case law affirms that § 1001 incorporates two separate and distinct offenses: (1) concealing material facts from a federal agency by trick, scheme or device *or* (2) making false or fraudulent representations to a federal agency or department.[2] *See Anzalone,* 766 F.2d at 682; *United States v. Tobon-Builes,* 706 F.2d 1092, 1096 (11th Cir.1983); *United States v. Diogo,* 320 F.2d 898, 902 (2d Cir.1963). The government might have prosecuted Sacharczyk for allegedly making false statements to IRS investigative agents, *see United States v. Morris,* 741 F.2d 188, 189–90 (8th Cir.1984), but it did not do so. The government might have prosecuted her for false statements made to DiPerna as a *de facto* federal agent, but it did not do so. St. Michael's and Sacharczyk were indicted for the "trick, scheme or device" offense of § 1001. The law does not allow the government to advance a different theory of prosecution on appeal. This would nullify the purpose of an indictment.

The government asserts that "misrepresentation alone" may be enough to sustain a conviction under the trick, scheme or device offense of § 1001. It is sufficient, however, only where the defendant has been charged with the offense of making "false, fictitious or fraudulent statements or representations." 18 U.S.C. § 1001. The case cited as support for the government's position is in accord with this. In *United States v. Woodward,* as the government points out, the Supreme Court stated in a footnote that an affirmative misrepresentation alone would support a § 1001 conviction. If the entire footnote is read, however, it is clear that the Supreme Court was speaking only of a prosecution for making false statements.

> In Woodward's case, the Government did not have to prove the existence of a trick, scheme, or device. *Woodward was charged with violating 1001 because he made a false statement* on the customs form. This type of affirmative misrepresentation is proscribed under the statute even if not accompanied by a trick, scheme, or device.

*Woodward,* 469 U.S. at 108 n. 4, 105 S.Ct. at 612 n. 4 (emphasis added).

The government also asserts that, in two circuits, "concealment of material facts from the IRS in itself is violative of section 1001." In other words, the government argues that the mere failure to file might support a conviction under § 1001 without additional proof of an affirmative act of concealment. We do not believe the cases cited by the government stand for that proposition. *See United States v. Nersesian,* 824 F.2d 1294 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); *United States v. Puerto,* 730 F.2d 627 (11th Cir.), *cert. denied,* 469 U.S. 847,

2. We construe 56(b) to charge the offense of concealing by trick, scheme or device a material fact from the IRS, as did the district judge. *See supra* pp. 588–589. The "false representation" noted in the final clause is the affirmative act of concealment necessary to establish the trick, scheme or device under § 1001.

105 S.Ct. 162, 83 L.Ed.2d 98 (1984). Both of these cases presented more than a simple failure to file CTRs. In each case, the defendants affirmatively structured their currency transactions as part of a scheme to cause the Banks to fail to file CTRs. *See Nersesian,* 824 F.2d at 1312–13; *Puerto,* 730 F.2d at 632–33. That scenario is different from one where a bank has passively failed to file CTRs. Absent other acts that might form part of a scheme to affirmatively conceal facts from a federal agency, we do not believe the failure to file CTRs—standing alone—can support a conviction under § 1001.

B. *The Jurisdictional Requirement*

Section 1001 prohibits misrepresentations and affirmative concealments "in any matter within the jurisdiction of any department or agency of the United States." Defendants argue that the affirmative acts of concealment proffered by the government —Sacharczyk's actions concerning the French and Perry CTRs—were not matters within the jurisdiction of the IRS. Even if the government's evidence is accepted, defendants contend that the most Sacharczyk has done is conceal facts from a *state* agency. We do not agree.

The Supreme Court has held that the "statutory language requiring that knowingly false statements be made 'in any matter within the jurisdiction of any department or agency of the United States' is a jurisdictional requirement. Its primary purpose is to identify the factor that makes the false statement an appropriate subject for federal concern." *United States v. Yermian,* 468 U.S. 63, 68, 104 S.Ct. 2936, 2939, 82 L.Ed.2d 53 (1984). The Court has also consistently held that the jurisdictional clause of § 1001 should be given a broad interpretation. *See United States v. Rogers,* 466 U.S. 475, 479–84, 104 S.Ct. 1942, 1946–48, 80 L.Ed.2d 492 (1984); *Bryson v. United States,* 396 U.S. 64, 71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969); *United States v. Notarantonio,* 758 F.2d 777 (1st Cir.1985); *see also United States v. Bramblett,* 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955) ("There is no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted.").

In this circuit, as in virtually all others, it has been held that a concealment or misrepresentation need not be made directly to a federal agency or department to sustain a § 1001 conviction. *See Notarantonio,* 758 F.2d at 787 (collecting cases); *United States v. Suggs,* 755 F.2d 1538, 1542 (11th Cir.1985) (same); *United States v. Richmond,* 700 F.2d 1183, 1187–88 (8th Cir.1983) (same). The government, however, must prove a nexus, a "necessary link," between the deception of the nonfederal agency and the function of a federal agency. *United States v. Petullo,* 709 F.2d 1178, 1180 (7th Cir.1983) (quoting *United States v. Baker,* 626 F.2d 512, 514 n. 5 (5th Cir. (1980)); *see Notarantonio,* 758 F.2d at 787. The link may be established by showing that the concealments or " 'false statements ... result in the perversion of the authorized functions of a federal department or agency.' " *Notarantonio,* 758 F.2d at 787 (quoting *United States v. Stanford,* 589 F.2d 285, 297 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979)).[3]

Defendants' argument that there is no necessary link between Sacharczyk's actions and statements concerning the

3. Both parties suggest that to properly determine whether a statement or concealment is in a matter within the jurisdiction of a federal agency, we must focus on whether the falsity would have "the natural tendency to influence, or [be] capable of influencing the [federal] agency." *United States v. Dick,* 744 F.2d 546, 553 (7th Cir.1984); *see also Notarantonio,* 758 F.2d 777, 785–86 (1st Cir.1985) (collecting cases on same point). The parties have confused the standard for determining the *materiality* of a falsity with the standard for determining whether the falsity concerns a matter within the jurisdiction of a federal agency. Although materiality and jurisdiction may be related issues, *see United States v. Wolf,* 645 F.2d 23, 25 (10th Cir.1981); *United States v. DiFonzo,* 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980), they are separate elements of a § 1001 offense and each has its own test. *See Notarantonio,* 758 F.2d at 785–88; *Richmond,* 700 F.2d 1183, 1187–88 (8th Cir.1983); *compare Stanford,* 589 F.2d at 297–98; *with Dick,* 744 F.2d at 553.

French and Perry CTRs and the jurisdiction of the IRS is misplaced. All of the cases cited for support by the defendants concern prosecutions under § 1001 for making false representations or statements to a non-federal agency. The question presented was whether the false statements impacted the function of a federal agency. *See, e.g., Petullo,* 709 F.2d at 1179–80 (false work vouchers submitted to city which used some federal funds to pay for the work); *United States v. Baker,* 626 F.2d 512 (5th Cir.1980) (false time sheets submitted to city for services provided under federal grant); *United States v. Candella,* 487 F.2d 1223 (2d Cir.1973) (false statements made to city agency to obtain federal monies), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974).

The case at bar presents a different scenario. Defendants were prosecuted for "knowingly and willfully conceal[ing] and cover[ing] up, by trick, scheme, and device, material facts to the Internal Revenue Service, by failing to file, and causing the failure to file Currency Transaction Reports." The failure to file CTRs clearly falls within the jurisdiction of the IRS. Although not so explicitly stated, defendants' position is that the *affirmative acts* alleged by the government that form the basis for the trick, scheme, or device element of a § 1001 offense also must have taken place within the jurisdiction of a federal agency. We do not agree.

The jurisdictional element of a § 1001 offense is controlled by the substantive falsehoods or acts of concealment charged in the indictment. Whether the prosecution is for making a false statement or for concealing a material fact, the jurisdictional element of § 1001 turns on whether the falsity or coverup would result in the "perversion of the authorized functions of a federal agency or department." *Notarantonio,* 758 F.2d at 787 (quoting *Stanford,* 589 F.2d at 297). When the prosecution is for a coverup or concealment, however, there is the additional requirement of proving a trick, scheme or device. *See Woodward,* 469 U.S. at 108, 105 S.Ct. at 612; *supra* pp. 589, 590. To establish this the government must prove some affirmative act of concealment. *See Shannon,* 836 F.2d at 1129–30; *supra* at 589, 590. We do not construe this requirement to mean that every aspect of the scheme, trick or device must be confined within the jurisdiction of a federal agency. It is enough that the underlying concealment fall within that jurisdiction. Here, the failure to file CTRs places this case within the jurisdiction of the IRS. That failure perverts the functions of the IRS. Sacharczyk's actions concerning the French and Perry CTRs are the affirmative acts that must be proven to establish a trick, scheme or device under § 1001. Since the trick, scheme or device is purely derivative of and dependent upon the underlying concealment, we believe the proper jurisdictional focus should be on the concealment.

Even if we accepted defendants' argument that the affirmative acts must also be within the jurisdiction of a federal agency, our result would remain unchanged. The government produced evidence that: (1) DiPerna, the state bank examiner, had been directed by the IRS to begin enforcing the rules and regulations concerning CTRs; (2) DiPerna examined St. Michael's in part to ensure their compliance with federal laws regarding CTRs; (3) during the examination, he discovered two reportable transactions for which no CTRs had been filed; (4) he informed Sacharczyk that if they were filed with the IRS he would not mention them in his report; (5) Sacharczyk filled out CTR forms for the two transactions; (6) she showed copies of them to DiPerna and stated that she had filed them with the IRS; (7) DiPerna did not report the credit union's previous failure to file these CTRs; (8) Sacharczyk never, in fact, filed the two CTRs.

These actions and representations perverted the functioning of the IRS. For these two reportable transactions, no CTRs were filed. But for the alleged ruse engineered by Sacharczyk, the IRS would have learned of the omissions from DiPerna's report. As DiPerna testified, he was at the credit union to ensure its compliance with the federal laws. The IRS must rely on

such local examiners to ferret out violations. By allegedly duping this agent, Sacharczyk successfully avoided IRS discovery of St. Michael's failure to file CTRs. We believe this suffices to place her alleged actions within the jurisdiction of a federal agency even under the defendants' standard.

To sum up. There is no jurisdictional bar to the § 1001 count. Although there was sufficient evidence for a conviction, the jury instruction was fatally flawed and the conviction cannot be salvaged by any of the theories advanced by the government. The conviction on this count must, therefore, be vacated.

## V. REPORTABILITY OF THE LAGANAS TRANSACTIONS

Defendants next argue that ten of their convictions for failing to file CTRs (Counts 3, 5, 10, 13, 17, 19, 20, 22, 24, and 41) should be reversed because the transactions fell outside of the Act's reporting requirements. They assert that the transactions involving Paul Laganas did not constitute exchanges of currency in excess of $10,000 and, therefore, were not reportable. We examine these transactions in detail.

In nine of the these transactions, Laganas came to the credit union and presented a number (10–50) of third-party checks that were endorsed over to him. These checks, while individually well under $10,000, together exceeded that amount. At the end of each transaction, Laganas was given over $10,000 in cash. The defendants argue that since Laganas presented the teller with numerous checks, these transfers should be considered multiple transactions. They maintain that a bank has a duty to file CTRs on multiple transactions that exceed $10,000 only where it knows that the exchanges have been structured to avoid the CTR requirements. This argument is contrary to the law of this circuit.

Under our holding in *Bank of New England, N.A.*, 821 F.2d 844 (1st Cir.), *cert. denied*, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987), cashing a number of checks at one time, which together total more than $10,000 is a single transaction. There were, therefore, nine such transactions here. Because the factual scenario between the two cases is so close, we quote at length from *Bank of New England.*

> In the instant case, McDonough's [Defendant's] practice was to visit the same branch of the same bank on only one occasion in a single day. He simultaneously would present a single bank teller two to four checks, all made payable to cash, for varying amounts under $10,000 which, when added together, equalled a sum greater than $10,000. In return, the same bank teller would transfer to him in a single motion a wad of cash totalling more than $10,000.
>
> We have no trouble categorizing such conduct as a single physical transfer of currency in excess of $10,000 from the Bank to McDonough. We, therefore, conclude that the language of the regulations itself gave the Bank fair warning that McDonough's transactions were reportable. This case does not, as the Bank suggests, involve a bank customer engaging in multiple currency transactions. McDonough engaged in thirty-one separate transactions, each exceeding $10,000, which were effected by the use of multiple checks. The use of multiple checks during a single transfer of currency is not the same as multiple currency transactions.

*Bank of New England,* 821 F.2d at 849.

That the Laganas transactions may not have been deceptively structured to avoid the requirements of the Act does not warrant a different result. The holding in *Bank of New England* controls. We find that nine of the Laganas transactions were reportable.

The tenth Laganas transaction, Count three, is more troubling. Count three charged that the defendants violated the Act by failing to file a CTR for the Laganas transactions that occurred on September 23, 1983. On that date Laganas made four trips to the credit union, cashing

checks at each visit. His September 23, 1983 transactions were as follows:

1. Time: 11:28 a.m.
   Teller: Coyne
   Checks: $97.00; 224.13; 153.80; 51.-05; 111.16; 130.48; 148.01; 100.00; 126.00; 271.25; 125.-30; 237.39; 161.00; 232.42; 152.58; 150.00; 103.95.
   Total: $2,575.52

2. Time: 2:01 p.m.
   Teller: Coyne
   Checks: $97.80
   Total: $97.80

3. Time: 4:56 p.m.
   Teller: Maribito
   Checks: $118.00; 118.00; 42.40; 329.-80; 356.00; 345.00; 164.46; 291.22; 361.97; 121.75; 975.-45; 650.00; 132.00; 5,000.00
   Total: $9,006.05

4. Time: 7:04 p.m.
   Teller: Maribito
   Checks: $85.84; 69.66; 3,000; 90.00
   Total: $3,245.50
   Overall Total for Day: $14,924.87

The government argues that these four multiple transactions should be aggregated and seen as a single transfer totalling $14,-834.87.[4] The defendants maintain that neither the Act nor its implementing regulations can be read to require the aggregation of these multiple transactions into one reportable exchange. Such a reading, they contend, would violate the notice provisions of the fifth amendment. There is a rift in the circuits on this issue; we come down on the side of the defendants.

To guide our analysis, we begin by plotting this circuit's two fixed stars concerning the interpretation of the Currency Transactions Reporting Act. In *United States v. Anzalone,* 766 F.2d 676, the defendant engaged in a series of transactions with a bank conducted over a number of days. While separately each transaction was non-reportable, when aggregated, they exceeded $10,000. Anzalone was prosecuted for structuring his transactions so as to conceal their reportability from the bank and escape the Act's reporting requirements. Although the case involved an individual defendant, his liability turned, in part, on whether the financial institution had a duty to file CTRs for his exchanges. We held that the Act does not require a financial institution to file CTRs on multiple transactions that were carried out at the same bank but on different days, so long as the institution had no knowledge that the exchanges were spaced so as to circumvent the Act's reporting requirements. *See Id.* at 683. The court determined that the Act and its regulations only gave notice that single transfers in excess of $10,000 were reportable. Prosecutions for failing to file CTRs for multiple transactions, therefore, were violative of the notice requirements of the fifth amendment. *See Id.* at 681–82. A concurrence suggested that multiple transactions that totalled over $10,000, and were carried out on the same day at the same bank (or different branches of the same bank) might constitute a single, reportable transaction. *See Id.* at 684 (Aldrich, Senior Judge, concurring). That issue, however, was neither presented to nor decided by the *Anzalone* court. *See Bank of New England,* 821 F.2d at 851.

Our second bearing comes from *Bank of New England.* As discussed, *supra,* the defendants in that case argued that presenting multiple checks to a bank at the same time on the same day should be considered unreportable "multiple transactions" under the rationale of *Anzalone.* We distinguished between multiple transactions performed on different days and multiple check exchanges performed at one time on the same day. In the latter case, we held that such an exchange is not a multiple transaction but a single exchange subject to the Act's reporting requirements. *See Bank of New England,* 821 F.2d at 851. Although some circuits have cited *Bank of New England* for the proposition that banks are required to aggregate all transactions of an individual customer

4. On appeal the government suggests that we focus solely on the last two transactions, since taken together they constitute an exchange of over $10,000. That approach would affect neither our reasoning nor our result.

that are performed at the same bank, on the same day but at different times, *see e.g. United States v. Gimbel,* 830 F.2d 621, 625 (7th Cir.1987), that question was not decided by us.

Each of the parties in the instant action gleans different lessons from *Anzalone* and *Bank of New England.* The defendants contend that as in *Anzalone,* Laganas' four exchanges of currency, which were made at different times on September 23, 1983, should be considered multiple transactions. Since no individual exchange exceeded $10,000, there was no requirement to file a CTR for the transactions. The government, on the other hand, urges that we look behind these temporal differences and assess the economic reality of Laganas' transactions. The simple fact is that no matter what number of trips Laganas made to the credit union on September 23, 1983, he exchanged checks for a cash sum totalling over $10,000. Since the purpose of the Act is to deter money laundering and related uses of illegal gains, the government asserts that allowing defendants to escape the Act's reporting requirements simply by dividing transactions into smaller amounts would defeat the goals of the statute. Since neither *Anzalone* nor *Bank of New England* are dispositive of this issue, we look to our sister circuits.

Our research reveals that five other circuits have considered whether a financial institution is required to file a CTR for an individual's multiple transactions, which were carried out at the same bank, on the same day, but at different times. The Fifth and Eleventh Circuits have held that the Act's reporting requirements reach these types of transactions. The cases indicate that these circuits would look behind the form of the transaction and assess its economic reality. *See e.g. United States v. Tobon–Builes,* 706 F.2d 1092, 1098 (11th Cir.1983) (adopting "substance-over-form approach"). As the Seventh Circuit has recently noted, "these circuits have read the regulations requiring financial institutions to report each 'physical transfer' of currency in excess of $10,000 to mean that a financial institution must aggregate all transactions by one customer on one day." *Gimbel,* 830 F.2d at 625; *see Tobon–Builes,* 706 F.2d at 1098–99 (multiple exchanges made at same branch on same day); *United States v. Thompson,* 603 F.2d 1200, 1202–03 (5th Cir.1979) (same); *see also United States v. Heyman,* 794 F.2d 788, 792 (2d Cir.) (suggesting same requirements), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). This reasoning has been extended to require aggregation of same day exchanges of both individuals and their associates that were made at different branches of the same bank. *See United States v. Meros,* 866 F.2d 1304, 1311 (11th Cir.1989); *United States v. Lafaurie,* 833 F.2d 1468, 1470–71 (11th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2015, 100 L.Ed.2d 602 (1988); *United States v. Cure,* 804 F.2d 625, 629 (11th Cir.1986) (*per curiam*); *United States v. Giancola,* 783 F.2d 1549, 1552–53 (11th Cir.), *cert. denied,* 479 U.S. 1018, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986). Where the same day transactions are performed at different banks, however, there is no duty to file a report. *See Meros,* 866 F.2d at 1311; *United States v. Denemark,* 779 F.2d 1559, 1562–64 (11th Cir.1986); *see also United States v. Torres Lebron,* 704 F.Supp. 332, 335–36 (D.P.R.1989) (favorably citing the above cases).

While these interpretations of the Act and its regulations allow for the vigorous enforcement of the currency laws, we find the interpretations offered by the Seventh, Eighth and Ninth Circuits to be on firmer constitutional ground. They hold that a financial institution has no duty to aggregate into one reportable transaction separate physical transfers of currency made on the same day. *See United States v. Risk,* 843 F.2d 1059, 1061–62 (7th Cir.1988) (exchange made at same branch of one bank); *United States v. Gimbel,* 830 F.2d at 625–26 (7th Cir.1987) (same); *United States v. Larson,* 796 F.2d 244, 245–46 (8th Cir.1986) (both same and different branches of two banks on same day); *United States v. Varbel,* 780 F.2d 758, 762 (9th Cir.1986) (same day, different banks); *United States v. Dela Espriella,* 781 F.2d 1432, 1435 (9th Cir.1986) (associates made

exchanges at different banks on same day); *United States v. Reinis*, 794 F.2d 506, 508 (9th Cir.1986) (different branches of same bank on same day); *see also United States v. Mastronardo*, 849 F.2d 799, 802–03 (3d Cir.1988) (stating the Act does not prohibit a customer from structuring his transactions to avoid reporting requirements). As the Seventh Circuit has recently noted:

> [T]he Currency Transactions Reporting Act did not require the reporting of transactions in excess of $10,000. The Act did nothing more than authorize the Secretary of the Treasury to promulgate regulations governing disclosure. *See United States v. Larson*, 796 F.2d 244, 245 (8th Cir.1986). The regulations that the Secretary promulgated under this authority did not expressly require aggregation. Rather, they merely required financial institutions to report "physical transfers of currency," 31 C.F.R. § 103.11 (1986), in excess of $10,000. The essential characteristic of a structured transaction is that the customer effects several discrete "physical transfer[s] of currency," *id.* The original regulations gave no hint that financial institutions were required to assess the economic reality behind these acts.

*Gimbel*, 830 F.2d at 625.

Since aggregation is not explicitly or implicitly required by either the statute or its implementing regulations, we find that imposing criminal liability for such conduct violates the notice provisions of the fifth amendment. *See Anzalone*, 766 F.2d at 680–82. Our decision is also influenced by the venerated tenet that penal statutes must be strictly construed. *See McNally v. United States*, 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987); *Dowling v. United States*, 473 U.S. 207 213–14, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985); *Anzalone*, 766 F.2d at 680–81 (collecting authorities). We understand that this holding leaves an interstice in the Act that is, no doubt, at odds with the congressional purpose of eradicating money laundering. We remain convinced, however, that

> [a]lthough this court, like all other institutions of the United States, is supportive of the law enforcement goals of the government and society, we cannot engage in unprincipled interpretation of the law, lest we foment lawlessness instead of compliance. *Kolender v. Lawson*, 461 U.S. 352, 361, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983). This is particularly so when the confusion and uncertainty in this law has been caused by the government itself, and when the solution to that situation, namely eliminating any perceived loop holes, lies completely within the government's control. If the government wishes to impose a duty ... to report "structured" transactions, let it require so in plain language. It should not attempt to impose such a duty by implication, expecting that the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation.

*United States v. Anzalone*, 766 F.2d at 682 (footnotes omitted).[5] Defendants' convictions under Count three are, therefore, reversed.

We pause to reaffirm the basis of our holding in *Bank of New England*. There, we upheld convictions stemming from multi-check exchanges totalling over $10,000 that were made at "one bank in one day to a single customer during a single visit." *Bank of New England*, 821 F.2d at 850. We held that the regulations then in effect gave sufficient notice to the financial institutions that such exchanges were reportable, since they involved a single physical exchange of currency in excess of $10,000. *See* 31 C.F.R. § 103.11. At the core of our decision was the holding that a multi-check exchange, made during a single visit, could not be considered "multiple transactions." *See Bank of New England*, 821 F.2d at 848–50. Our holding today applies only

5. The Secretary has recently closed the multiple transaction loophole by promulgating 31 C.F.R. § 103.22(a)(1), which provides in pertinent part: "Multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totalling more than $10,000 during any one business day...."

where currency transactions are made at different times in a single day. Such transactions are multiple and cannot be aggregated to trigger the reporting requirements of the Act.

## VI. THE MISSING WITNESS INSTRUCTION

Defendants next argue that the trial court erred by failing to give a missing witness instruction as a result of the government's failure to call Paul Laganas to the stand. They assert that the trial judge used an incorrect standard to determine whether to give the instruction.

The rationale behind the missing witness instruction has been stated as follows: "the failure of a party to produce available evidence that would help decide an issue may justify an inference that the evidence would be unfavorable to the party to whom it is available or whom it would ordinarily be expected to favor." 2 C. Wright, *Federal Practice and Procedure* § 489 (1982). First Circuit precedent has established three circumstances that may warrant a missing witness instruction.

> [T]he jury may draw an inference adverse to a party toward whom the missing witness is "favorably disposed," because the party would normally be expected to produce such a witness, *see United States v. Johnson, supra,* 467 F.2d at 809; *United States v. Wright, supra,* 573 F.2d at 684. In addition, the jury may draw an adverse inference when a party fails to produce a material witness who is peculiarly available to that party. *United States v. Davila Williams, supra* [496 F.2d 378 (1st Cir. 1974)], *United States v. Diaz, supra* [535 F.2d 130 (1st Cir.1976)]. *See* 2 C. Wright, Federal Practice & Procedure, Criminal § 489 (1969).... [Finally], when a party having *exclusive* control over a witness who could provide relevant, noncumulative testimony fails to produce the witness, it is permissible to draw an adverse inference from that party's failure to do so, even in the absence of any showing of the witness's predisposition toward the party. *See United States v. Johnson,* 562 F.2d 515, 517 (8th Cir.1977).

*United States v. Ariza–Ibarra,* 651 F.2d 2, 16 (1st Cir.) (emphasis in original), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). The final decision of whether or not to give such an instruction is committed to the sound discretion of the district judge. *See United States v. Tarantino,* 846 F.2d 1384, 1404 (D.C.Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *Cameo Convalescent Center v. Senn,* 738 F.2d 836, 844 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985).

The defendants contend that Laganas was "peculiarly available" to and within the "exclusive control" of the government because he had indicated that were he called as a witness, he would assert his fifth amendment rights and refuse to testify. Since the government has the right to grant immunity from prosecution to a witness,[6] defendants maintain its failure to do so mandates an adverse inference against the government. This is especially so, they argue, where, as in this case, the government referred to Laganas and his currency transfers in a way designed to imply that they were related to illicit activities.

Absent a claim of favorable disposition, where a witness is equally available to either party there is ordinarily no basis for a missing witness instruction. *See United States v. Currier,* 454 F.2d 835, 839 (1st Cir.1972); 2 C. Wright *Federal Practice and Procedure,* § 489, at 744 (1982) (collecting authorities). The question presented here is whether the government's power to grant immunity from prosecution makes Laganas more available—peculiarly available—to the government. We hold that it does not.

Although not noted by the parties, our research indicates that at least two circuits have dealt with this issue. Both are in

6. We continue to leave open the question of whether, under certain circumstances, "due process might require immunization of defense witnesses." *United States v. Flaherty,* 668 F.2d 566, 583 n. 6 (1st Cir.1981); *see United States v. Davis,* 623 F.2d 188, 193 (1st Cir.1980); *In re Grand Jury Proceedings of United States,* 626 F.2d 1051, 1057 n. 5 (1st Cir.1980).

accord in holding that the government's failure to immunize a witness, without more, does not give rise to a missing witness instruction. *See United States v. Flomenhoft,* 714 F.2d 708, 713–14 (7th Cir. 1983), *cert. denied,* 465 U.S. 1068, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984); *United States v. Simmons,* 663 F.2d 107, 108 (D.C.Cir. 1979); *Bowles v. United States,* 439 F.2d 536, 542 (D.C.Cir.1970), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971); *Morrison v. United States,* 365 F.2d 521, 524 (D.C.1966); *see also United States v. Tarantino,* 846 F.2d at 1404 (no adverse inference to be drawn when government immunizes witness); *United States v. Keplinger,* 776 F.2d 678, 702 (7th Cir.1985) (same), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). The *ratio decendi* of these decisions was stated succinctly by the Seventh Circuit:

> Congress has conferred the power to immunize witnesses uniquely upon the executive branch. *United States v. Frans,* 697 F.2d 188 (7th Cir.1983). The immunization statutes are not designed to benefit defendants. 697 F.2d at 191. Absent a substantial showing of prosecutorial abuse of discretion, courts will not review a prosecutor's immunization decision. *United States v. Frans, supra; In re Perlin,* 589 F.2d 260, 269 (7th Cir. 1978); *United States v. Smith,* 542 F.2d 711, 715 (7th Cir.1976) ("The law is clear that in this Circuit a district court is powerless to direct the prosecution to seek use immunity in order to secure testimony which the defendant deems relevant."); *United States v. Rauhoff,* 525 F.2d 1170, 1178 (7th Cir.1975); *United States v. Allstate Mortgage Corp.,* 507 F.2d 492, 494–95 (7th Cir.1974), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975).
>
> Requiring a missing witness instruction each time the prosecution decides not to immunize a witness would constitute a substantial judicial encroachment upon prosecutorial discretion. This is not a case where there has been a clear prosecutorial abuse of discretion violating the due process clause. The district court properly refused Flomenhoft's missing witness instruction.

*Flomenhoft,* 714 F.2d at 713–14; *see Morrison,* 365 F.2d at 524 (noting same). We find these considerations persuasive.

A witness' decision to invoke his fifth amendment privilege against testifying makes him neither peculiarly available to the government nor within the government's exclusive control. Based on the evidence presented below, the trial judge determined Laganas was "available to anybody and that he's capable of testifying." Laganas' purported assertion of his fifth amendment rights changes this finding only by making him "equally unavailable" to both parties. *United States v. Simmons,* 663 F.2d at 108.

The defendants stress that they do not argue for a blanket rule requiring a missing witness instruction whenever the government refuses to immunize an unwilling witness. They assert that a missing witness instruction is appropriate here, because the government: (1) stated it could not find Laganas when, in fact, he had been at a known address throughout the trial; (2) selectively obtained immunity for other witnesses; and (3) built a large part of its case around a witness who had asserted his fifth amendment rights.[7] The flaw in the defendants' argument is its inherent dependency upon the government's failure to immunize Laganas. As we stated above, absent some abuse of discretion, we do not believe a negative inference may be drawn from that prosecutorial decision. Stripped of its references to the immunity denial, defendants' argument for a missing witness instruction is reduced to the contention that the government should have called Laganas because he was involved in many of the indicated transactions and because the government implied that his transactions were part of an illegal operation. Neither of these asseverations make Laganas peculiarly available to or within the exclusive control of

7. There is a disagreement over whether, if immunized, Laganas' testimony would have helped the defendants. Defendants contend that he would have undermined the government's case, while the government maintains that Laganas' testimony would have aided the prosecution.

the government.[8] We affirm the district judge's decision not to issue a missing witness instruction.

## VII. THE ADMISSION OF EXTRINSIC GAMBLING EVIDENCE

The defendants vigorously protest the district court's admission of certain evidence concerning the alleged gambling activities of Janice Sacharczyk's father, Chester Szczawinski. They assert that absent proof of Sacharczyk's knowledge of these illicit activities, they were irrelevant to any material fact at issue in this case. Moreover, they contend that even if the evidence had some slight relevancy, its probative value was greatly outweighed by the unfairly prejudicial impact its introduction probably had upon the jury. The government maintains that the evidence was relevant and highly probative of whether Sacharczyk had either a specific intent or a motive to violate the Act's reporting requirements.

### A. *The Evidence*

Two witnesses testified regarding Chester Szczawinski's gambling operation. Francis Falkowski was Chester Szczawinski's nephew and a former president of St. Michael's. He resigned from the credit union in September, 1983. He testified that he believed Szczawinski had engaged in bookmaking at the credit union. He based that conclusion on the following: (1) Szczawinski spent some amount of time in the basement offices at St. Michael's; (2) Falkowski had seen brown envelopes being passed from the upstairs offices of the credit union to those on the lower level; (3) one evening, after closing, Falkowski observed Szczawinski xeroxing a number of "football cards" (used for gambling) on the St. Michael's copying machine. There was no evidence presented that Janice Sacharczyk was at the credit union at these times or that she observed any of the activities allegedly seen by Falkowski.

The second witness to testify concerning Szczawinski's gambling activity was Philip DiNatale. DiNatale testified, under a grant of immunity, to the effect that Szczawinski was a bookmaker and that he had acted as Szczawinski's agent. Two of the transactions named in the indictment involved DiNatale and allegedly were connected to Szcawinski's gambling operation. In describing those transactions, DiNatale testified that he twice went to St. Michael's to secure Treasurer's checks in order to pay a gambling debt owed by Szczawinski to a customer. DiNatale stated that he paid the debt in Treasurer's checks because the customer had requested it. DiNatale stated further that he went to St. Michael's to obtain the checks only because he had an account there; he had not been ordered "to use" St. Michael's for the transaction. DiNatale testified that Szczawinski did not even know he was obtaining Treasurer's checks to pay the debt. To DiNatale's knowledge, no bookmaking had ever taken place at St. Michael's. As for defendant Sacharczyk, DiNatale testified that she had nothing to do with his Treasurer's check transactions. When he was asked whether he knew Janice Sacharczyk, he responded, "A little, very little."

### B. *The Law*

In order for evidence to be admitted at trial, it must be relevant to a material fact

8. Defendants do not argue that Laganas would have been "favorably disposed" to the government, presumably because of their argument that had he been granted immunity, his testimony would have undermined the government's case. *See United States v. Ariza-Ibarra,* 651 F.2d 2, 16 (1st Cir.1981). A review of the record, however, reveals that the district judge was concerned not by the fact that Laganas was peculiarly available to the government, but by the fact that the government had portrayed him as a person whose testimony would be damaging to the defense. The judge seemed to feel that based on the government's references to Laganas, the jury might have inferred that his testimony would have aided the prosecution. Since the government failed to call him, the judge concluded that a negative inference could be drawn against the prosecution. As the defendants have not argued the point, we have no occasion to consider whether a witness in Laganas' adverse position might ever be considered "favorably disposed" to the government for the purposes of a missing witness instruction.

at issue, and its probative value must not be substantially outweighed by its unfairly harmful or prejudicial effect upon the jury. *See* Fed.R.Evid. 401, 402 & 403; *United States v. Lamberty,* 778 F.2d 59, 60–62 (1st Cir.1985), *United States v. Mann,* 590 F.2d 361, 369–70 (1st Cir.1978). The resolution of such evidentiary questions is committed to the discretion of the district court judge, and the abuse of discretion standard guides our review. *See United States v. Lynn,* 856 F.2d 430, 437 (1st Cir.1988); *United States v. Southard,* 700 F.2d 1, 13 (1st Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *United States v. Mehtala,* 578 F.2d 6, 9 (1st Cir.1978); *United States v. Coast of Maine Lobster Co.,* 557 F.2d 905, 908 (1st Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136 (1977).

"Evidence is relevant if it has any tendency to make the existence of any fact consequential to the determination of the action more or less probable." *Lamberty,* 778 F.2d at 61; *see* Fed.R.Evid 401; C. Wright & K. Graham, Jr., *Federal Practice and Procedure* § 5165 (1978) (collecting cases). The government asserts that evidence concerning Chester Szczawinski's alleged gambling activities

> was highly relevant to the element of willfulness the government must prove in a 31 U.S.C. § 5322 violation. Willfulness in almost every case must be proven indirectly since it is a state of mind; it is "usually established by drawing reasonable inferences from the available facts." *United States v. Bank of New England,* 821 F.2d 844 (1st Cir.1987), *cert. denied,* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987) citing to *United States v. Wells,* 766 F.2d 12, 20 (1st Cir.1985). [The gambling evidence] was relevant to Sacharczyk's knowledge of the use of the Credit Union's cash resources, and any motive she might have had to act willfully.

Brief for the government at 16.

We accept the proposition that if the evidence shows, directly or by inference, that Sacharczyk knew or "must have known" of Szczawinski's gambling activities, it would be relevant to establishing both her intent and her motive in failing to file the CTRs. Despite the fact that the government conceded that Sacharczyk was not a part of the gambling operation, a jury might reasonably infer willfulness or motive if they found that Sacharczyk knew of customers and relatives who had reason to keep their $10,000 transactions hidden from the IRS.

As there was no direct evidence that Sacharczyk knew of her father's alleged gambling activities, their relevancy is dependent upon whether the evidence reasonably supports the inference that she must have known of those activities. There are three bases for such an inference. First, Chester Szczawinski spent some time on the premises of the credit union. Second, he occasionally told the loan officers to give loans to individuals for whom he vouched. The government asserts that these loans were used to finance Szczawinski's bookmaking operation. Third, Janice Sacharczyk is Chester Szczawinski's daughter. We do not believe these facts, even giving them the greatest possible weight, support an inference that Sacharczyk must have known of her father's gambling activities.

The first two arguments in support of the inference are easily dispatched. The government produced no evidence that Sacharczyk ever saw bookmaking at St. Michael's. DiNatale, Szczawinski's agent, testified that Chester Szczawinski did no gambling business at St. Michael's and that he had an office elsewhere for such purposes. Falkowski's testimony concerning the xeroxing of football cards does not affect our conclusion, because he could not place Sacharczyk at the credit union on that evening. There is no basis for finding that Sacharczyk saw any alleged xeroxing. Nor is there any connection between the loan approvals and Sacharczyk. Even if it were found that Szczawinski was instrumental in getting loans approved for certain individuals, there was no evidence that Sacharczyk had knowledge of all of the loan approvals much less of their allegedly illegitimate purpose. The government's argument that she sometimes recorded new

loans does not prove she knew of her father's role in the loan approvals or of their allegedly illicit purpose.

Nor do we believe that the daughter-father relationship between Sacharczyk and Szczawinski proves that she must have known of his alleged gambling activity. We have been able to find only one case that discusses what reasonable inferences might be drawn from a familial relationship. In *United States v. Williams,* 561 F.2d 859 (D.C.Cir.1977), the defendant had been convicted of armed bank robbery. The appeal questioned the admissibility into evidence of some of the money from the bank robbery, which had been found in the apartment of the defendant's sister. The sister was living with a man who was one of the bank robbers. The government produced no evidence of special rights of access by defendant to the apartment or of any conspiracy or joint venture between him and his sister's roommate. The "sibling relationship was the only nexus connecting [the defendant] with the money found in the apartment...." *Id.* at 862. The court concluded that the defendant's "blood relationship with one co-occupant of an apartment was an exceedingly thin strand to support the threshold requirement of relevance." *Id.*

In the case at bar, Szczawinski was not a charged co-conspirator, nor was Sacharczyk alleged to be part of the gambling operation. As in *Williams,* the main link between the alleged acts of Szczawinski and Sacharczyk's failure to file CTRs was their familial relationship. This is too weak a nexus to support the inference that Sacharczyk must have known of the gambling operation. While "[t]he gods [v]isit the sins of the fathers upon the children," Euripides, *Phrixus,* frag. 970, in the absence of evidence, the law must not.

The trial judge, at least initially, was also concerned that the gambling evidence was not relevant. When first notified that the government intended to introduce evidence concerning the gambling activities of third parties, the trial judge sought assurances from the government that it was going to prove that the defendants knew of the gambling activities. The government responded in the affirmative. The evidence, however, was later admitted without the assured foundation. Despite numerous objections, side-bar conferences, and written motions by defense counsel raising the issue, the trial judge never explained his ruling. While we do not and will not require a trial judge to set forth, on the record, his/her reasoning concerning evidentiary matters, we have noted on numerous occasions that such on-the-record rationale is one indicator of a thoughtful exercise of discretion. *See United States v. Mann,* 590 F.2d at 369; *United States v. Anzalone,* 783 F.2d 10, 112–14 (1st Cir. 1986); *United States v. Andiarena,* 823 F.2d 673, 677–78 (1st Cir.1987); *United States v. Southard,* 700 F.2d at 13.

We believe that the trial judge's original instincts were correct. Absent some nexus between Szczawinski's alleged gambling activities and the defendants in this case, the gambling evidence was irrelevant. We find, therefore, that the admission of that evidence constituted an abuse of discretion on relevancy grounds. *See* Fed.R.Evid. 401 & 402; *United States v. Cunningham,* 804 F.2d 58, 60–61 (6th Cir.1986) (evidence irrelevant where government failed to prove defendant had been aware of it); *see also United States v. Rios Ruiz,* 579 F.2d 670, 674–75 (1st Cir.1978) (evidence irrelevant when government failed to link it to defendants); *cf. United States v. Rodriguez–Estrada,* 877 F.2d 153 (1st Cir.1989) (prior bad acts may be admissible under Rule 404(b) when they are "inextricably intertwined" with the instant crimes charged).

Even were we to afford some minimal probative significance to the gambling evidence, we would still find its admission to be an abuse of discretion because its "probative value (if any) is substantially outweighed by the danger of unfair prejudice...." *United States v. Koger,* 646 F.2d 1194, 1198 (7th Cir.1981); *see* Fed.R. Evid. 403. Evidence is unfairly prejudicial if it might cause the jury "to base its decision on something other than the established propositions in the case." J. Wein-

stein & M. Berger, *Weinstein's Evidence*, ¶ 403[3], at 403–39 (1988); *see* Advisory Committee Note to Rule 403 ("an undue tendency to suggest decision on an improper basis...."); *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980) (defining prejudice similarly). The prejudicial danger in the instant action was that the jury may have convicted Sacharczyk on a theory of guilt by association. *See United States v. Flynn*, 852 F.2d 1045, 1054 (8th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 511, 102 L.Ed.2d 546 (1988); *United States v. Cunningham*, 804 F.2d 58, 60 (6th Cir. 1986), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1972, 95 L.Ed.2d 813 (1987); *United States v. DeCicco*, 435 F.2d 478, 483 (2d Cir.1970). Throughout most of the trial there was no mention of any illicit activity connected with the failure to file CTRs. The final two government witnesses, however, introduced an invidious criminal element into the case, in the person of Sacharczyk's father. Despite the fact that the government conceded that Sacharczyk was not involved in the gambling operation, and there was no connection between that operation and her, we believe the testimony implicitly and impermissibly linked the two together. This unsubstantiated and unwarranted connection was highly prejudicial to the defendants' case. Because the evidence's significant potential for prejudice greatly outweighed its minimal probativeness, we find that its admission constituted an abuse of discretion on the ground of "unfair prejudice." *See* Fed.R.Evid. 403.

These findings, however, do not end our inquiry. Although not addressed by the government, we must determine whether in light of the entire record the erroneous admission of the gambling evidence could be found harmless error beyond a reasonable doubt. *See Lamberty*, 778 F.2d at 62; *Mann*, 590 F.2d at 370–71. The path of our inquiry is well laid out.

> To answer this question, we have reviewed the entire record; we have considered the likely impact of the error on the minds of the jurors, *Kotteakos v. United States*, 328 U.S. 750, 763–64, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946); and we have asked ourselves whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [juror's] judgment was not substantially swayed by the error," *id.* at 765, 66 S.Ct. at 1248, *accord United States v. Pisari*, 636 F.2d 855, 859 (1st Cir.1981); *see* Fed.R.Crim.P. 52(a) (error harmless if it "does not affect substantial rights"). *Compare Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (higher standard for federal constitutional error).

*United States v. Mazza*, 792 F.2d 1210, 1216, 17 (1st Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987). We have analyzed the record as required and cannot say with any sanguinity that the jury's verdict would have been the same absent the tainted evidence. This was a very close case. The evidence was barely sufficient to support the charges and the theories advanced by the prosecution. The trial judge indicated as much:

> Now, I have got to say something, perfectly honestly, because I think it would be dishonest of me if I did not say so. There is a very thin thread here and I'm going to listen very closely, depending upon the testimony of the next two witness's, to motions for directed—for judgments of acquittal. I'm going to listen very closely to them. Because I think that this is a very thin case, this case, these women. I have got to tell you my honest feeling about it. I dislike taking matters away from a jury because if a jury goes in the direction in which the Judge happens to be tending it saves the Judge a problem. Do you know what I mean?
>
> So in civil cases, at any rate, ordinarily, what I do is let the jury decide it. They can always take the verdict away.
>
> In criminal cases, it's a different story, if the jury should convict. So I'm going to study these motions for directed findings of not guilty closely. And I think it's only fair for me to tell the government that.

We believe the prosecution overreached by introducing evidence of Szczawinski's

gambling activities without connecting them to the defendants. Because this error may well have swayed the jury's ultimate determinations of guilt, we have no choice but to remand for a new trial.

Since we vacate the defendants' convictions, we have no need to reach defendants' final argument that the prosecution's closing argument prejudiced their right to a fair trial. We note only that defendants' argument is based, in part, on the claim that the prosecution implicitly linked many of the transactions named in the indictment to Szczawinski's bookmaking. The prosecution's closing argument thus underscores and heightens the likelihood that the prejudicial impact of the admission of evidence concerning Szczawinski's gambling activities affected the jury's verdict.

## CONCLUSION

We hold the following:

(1) The evidence was sufficient to support both the trial judge's willful blindness instruction and the jury's finding of willful violations under 31 U.S.C. §§ 5313 & 5322(b).

(2) The transactions at issue were sufficiently repeated and related to form a "pattern of illegal activity" that would trigger the felony provision of the Act. 31 U.S.C. § 5322(b).

(3) The illegal activities alleged in the indictment were "within the jurisdiction of [a] department or agency of the United States." 18 U.S.C. § 1001.

(4) The judge's instructions failed to charge that an affirmative act of concealment is necessary to convict under the scheme, trick or device offense of 18 U.S.C. § 1001. This omission constitutes reversible error as to that count and a retrial is necessary.

(5) Nine of Laganas' transactions were multi-check exchanges made during one visit to a single bank. These fell within the Act's reporting requirements.

(6) One of Laganas' transfers (Count three) was a multiple transaction that did not implicate the Act's reporting requirements. The defendants' convictions on Count three are, therefore, reversed.

(7) No missing witness instruction was warranted because Laganas did not become peculiarly available to the government or within its exclusive control solely by asserting his fifth amendment rights.

(8) The introduction of gambling evidence concerning Sacharczyk's father constitutes reversible error.

We vacate, therefore, the defendants' convictions and remand for a new trial on all counts except Count three.

So ordered.